# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

|  |  |
|---|---|
| MOTION OFFENSE, LLC,<br><br>                   Plaintiff,<br><br>    v.<br><br>GOOGLE, LLC,<br><br>                   Defendant. | **Civil Action No. 6:21-cv-00514-ADA**<br><br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF MOTION OFFENSE LLC'S
## RESPONSIVE CLAIM CONSTRUCTION BRIEF

Dated:  February 17, 2022

/s/ Derek Dahlgren
Timothy Devlin
Derek Dahlgren (*pro hac vice*)
Srikant Cheruvu (*pro hac vice*)
Mariam E. Clayton (*pro hac vice*)
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010
tdevlin@devlinlawfirm.com
ddahlgren@devlinlawfirm.com
scheruvu@devlinlawfirm.com
mclayton@devlinlawfirm.com

*Attorneys for Motion Offense, LLC*

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................................... 1

II.  ARGUMENT ................................................................................................................ 2

    A.  U.S. Patent Nos. 10,303,353; 10,613,737; 11,044,215 ...................................... 2

        1.   "information associated with [the] at least one folder" ('353 patent, cl. 1; '737 patent, cl. 1; '215 patent, cls. 1, 19, 45, 51) ............................................................................ 2

        2.   "immediately follows" ('215 patent, cls. 19, 45) ................................................ 7

    B.  U.S. Patent No. 10,803,140 ............................................................................... 9

        1.   "transform" ('140 patent, cls. 1, 3, 9, 10, 22, 23, 25, 26) ................................. 9

        2.   "simultaneously" ('140 patent, cl. 1) ............................................................... 13

    C.  U.S. Patent No. 10,904,178 ............................................................................. 16

        1.   "attachment" ('178 patent, cls. 1-4, 18, 19) .................................................... 16

    D.  U.S. Patent No. 10,949,507 ............................................................................. 16

        1.   "security criterion" ('507 patent, cls. 1, 40, 42, 73) ........................................ 16

III. CONCLUSION ........................................................................................................... 18

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BASF Corp. v. Johnson Matthey Inc.*,
   875 F.3d 1360 (Fed. Cir. 2017)...................................................................... 8, 13, 16, 17

*Cont'l Circuits LLC v. Intel Corp.*,
   915 F.3d 788 (Fed. Cir. 2019)........................................................................................ 4

*Cox Commc'ns., Inc. v. Sprint Commc'n Co. LP*,
   838 F.3d 1224 (Fed. Cir. 2016) .................................................................................... 18

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*,
   849 F.2d 1430 (Fed. Cir. 1988)..................................................................................... 3

*Eko Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc.*,
   946 F.3d 1367 (Fed. Cir. 2020) .................................................................................... 6

*Image Processing Techs., LLC v. Samsung Elecs. Co.*,
   No. 2:16-CV-505,
   2017 U.S. Dist. LEXIS 95448 (E.D. Tex. June 21, 2017).............................................. 1

*Immunex Corp. v. Sanofi-Aventis U.S. LLC*,
   977 F.3d 1212 (Fed. Cir. 2020) .................................................................................... 6

*In re Gardner*,
   427 F.2d 786 (CCPA 1970) ........................................................................... 8, 13, 16, 17

*In re Miller*,
   441 F.2d 689 (CCPA 1971) ........................................................................... 8, 13, 16, 17

*Interval Licensing LLC v. AOL, Inc.*,
   766 F.3d 1364 (Fed. Cir. 2014).................................................................................... 15

*MONKEYmedia, Inc. v. Apple, Inc.*,
   No. A-10-CA-319-SS,
   2015 U.S. Dist. LEXIS 104982 (W.D. Tex. Aug. 10, 2015)........................................... 1

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014)..................................................................................................... 8

*Nobel Biocare Servs. AG v. Instradent USA, Inc.*,
   903 F.3d 1365 (Fed. Cir. 2018).................................................................................... 6

*OPTi Inc. v. nVidia Corp.*,
   No. 2:04-CV-377 (TJW),
   2006 U.S. Dist. LEXIS 22377 (E.D. Tex. Apr. 24, 2006)............................................. 9

*Smartmetric, Inc. v. Mastercard Int'l*,
   No. 2:10-cv-1864-JHN-FMOx,
   2011 U.S. Dist. LEXIS 170605 (C.D. Cal. May 18, 2011)........................................... 8

*SmithKline Beecham Corp. v. Apotex Corp.*,
   403 F.3d 1331 (Fed. Cir. 2005).................................................................................... 8

*U.S. Surgical Corp. v. Ethicon, Inc.*,
  103 F.3d 1554 (Fed. Cir. 1997)................................................................................................ 1

## I.       INTRODUCTION

Throughout its Opening Brief ("Br."), Google repeatedly contends that, simply because certain easily-understood terms (purportedly) can have multiple meanings, they are necessarily indefinite.  Google is wrong, because each of these terms has a plain and ordinary meaning that is easily understood by a person of skill in the art.  Moreover, each term is extensively described in the relevant patent specification and used consistently with its ordinary meaning in the claims.

Furthermore, with respect to the "information associated with [the] at least one folder" limitation, Google improperly seeks to import additional requirements into the claims that are not recited by the claim langue nor dictated by clean and unambiguous intrinsic evidence, as the law requires.  In doing so, Google even goes so far as to improperly exclude an exemplary embodiment of the specification.

Contrary to Google's arguments, the Federal Circuit, this Court, and other courts in this Circuit have repeatedly found that construction of terms is not necessary where, as here, the terms "have no meaning other than their plain and ordinary meaning and that the surrounding claim language provides sufficient meaning to the words in the claim terms."  *See, e.g.*, *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction . . . is not an obligatory exercise in redundancy."); *Image Processing Techs., LLC v. Samsung Elecs. Co.*, No. 2:16-CV-505, 2017 U.S. Dist. LEXIS 95448, at *27 (E.D. Tex. June 21, 2017); *MONKEYmedia, Inc. v. Apple, Inc.*, No. A-10-CA-319-SS, 2015 U.S. Dist. LEXIS 104982, at *12 (W.D. Tex. Aug. 10, 2015).  As Google's proposed terms here all have a plain and ordinary meaning consistent with their use in the claims and specification, Google's arguments should be rejected.

## II.     ARGUMENT

### A.     U.S. Patent Nos. 10,303,353; 10,613,737; 11,044,215

#### 1.     "information associated with [the] at least one folder" ('353 patent, cl. 1; '737 patent, cl. 1; '215 patent, cls. 1, 19, 45, 51)

| Motion Offense's Proposed Construction | Google's Proposed Construction |
|---|---|
| No construction necessary | "information previously connected to at least one existing folder" |

Google's proposed construction reads in extraneous limitations that are not recited by the plain language of the claims and have no support in the intrinsic record.  Namely, its construction requires that (1) the folder must previously exist, and (2) the received information must be previously associated with this pre-existing folder.  Google's proposal contradicts the plain language of the claims and would exclude one of the exemplary embodiments described in the specification.  It should be rejected.

The plain language of the claim, particularly when viewed as a whole as it must, contradicts Google's construction.  The claims at issue all recite "***receiving/receipt of/collecting*** information associated with at least one folder" at a "first node."  (*See e.g.*, '353 cl. 1; '737 cl. 1; '215 cl. 1.)  This limitation is satisfied simply by the first node receiving or collecting—from, say, a user—information associated with *a* folder.

Google seeks to manufacture a claim construction dispute by arguing that "it only makes sense that the information at issue must already be associated with the folder at the time it is received or collected."  (Br. at 3.)  However, nothing in the claim precludes the first node from *subsequently* creating a folder based on the information received from the user, as would be the case when the node creates a folder using the folder name (or other folder properties) entered via a text box or other user interface element.  The claims at issue are "comprising" claims, and

nothing precludes or requires "creating" the folder at any given time.  Rather, the omission of such a "creating" limitation serves to broaden the scope of the claims to include any manner and timing in which the folder may be generated or located.

Similarly, the claims do not require that the folder "pre-exist" anywhere, and Google does not provide any valid support for why it should.  Indeed, there is *nothing* in the intrinsic record that warrants reading in Google's extraneous limitations.  *See E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) (discussing the impropriety of reading "extraneous limitations" into the claims).

Google's next argument regarding the "tense" of the verb "associate" mischaracterizes the claim language.  Google argues that because "associated" is in the "past-tense," the information was previously associated with a folder at the time it was received or collected.  (Br. at 4.)  This fails for multiple reasons.  For example, Google omits key claim language for these limitations.  This language shows that information can become "associated" with a folder *at the time* it is received or collected by the first node via a "first user interface element."  (See '353 cl. 1, '737 cl. 1, '215 cl. 1.)  The dependent claims further confirm that the information is collected "in response to a . . . user input":

> 19. The method of claim 1, ***wherein the information associated with the at least one folder is capable of being collected utilizing the first user interface element in response to a first single user input***, the at least one object associated with the at least one email address is capable of being collected utilizing the second user interface element in response to a second single user input that immediately follows the first single user input, and the selection is capable of being detected utilizing the third user interface element in response to a third single user input that immediately follows the second single user input.

('215 patent cl. 19.)

That is, the claims do not require an association before the user inputs information using the user interface; instead, the claimed *interface* allows information to be associated.  As explained in further detail below, the specification of the '353/'737/'215 patents supports this

3

interpretation and includes embodiments where "information" is entered by the user, but need not be "associated" with a folder at the steps of "receiving" or "collecting" or when the system is configured according to the claims. Instead, it can be associated after the first claim step. Google does not point to any evidence of a "clear and unmistakable disclaimer" regarding such an "association." *See Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797-98 (Fed. Cir. 2019).

Google next attempts to analogize this limitation with the "object associated with at least one email address" limitation, but this analogy fails. First, Google did not propose the "email address" limitation for construction, so any arguments it now makes regarding it should be disregarded. In any event, Google's argument is a red herring because while the specification does not teach "creation" of an email address "by typing it into the user interface element," the specification teaches that a "data object" (i.e., folder) *is* created.[1] ('215 patent, 43:40-56.)

Google's attempted reliance on the specification is misplaced. The embodiment on which Google seeks to rely, where a user "request[s] a folder using a data object," is irrelevant. (Br. at 5, citing '353 patent at 38:8-29, 37:20-46.) That embodiment describes a scenario where *a user requests* a folder from another user and the second user then searches for the requested folder using a search criterion. ('353 patent at 38:8-29.) Indeed, the specification teaches that the use of a "data object request" is optional. ('353 patent at 35:3-9 ("first message 702 *may* be sent in response to previous message 716").) Therefore, this embodiment does not correspond to the limitation of *a first node receiving* information associated with a folder, as recited by the claims here.

Google next highlights the search button 656e in Fig. 6E below, and argues as follows:

the '215 Patent specification describes that Figure 6E refers to searching for existing data, using information that matches that data. *Id.* at 39:38–43 (Figure 6E "includes a search UI element 656e for receiving user input authorizing and/or

---

[1] The term "data object" is used consistently in specification to encompass a "folder" as well as other objects, such as "files." (*See* '215 patent at 33:24-26.)

otherwise instructing execution environment 401 of second node 504 to locate data objects that match the data object identification request."). Following the search described in Figure 6E, Figure 6F illustrates a response dialog wherein "[a] user may select one or more data objects to identify in a data object identification response" by choosing elements 664f or 666f. *Id.* at 40:55–41:25. Thus, the ***search results in identification of existing data***.



FIG. 6E                    FIG.6F

(Br. at 6.)

However, in selectively citing the specification's teachings of a data object "identification request," Google overlooks the following explicit disclosure that even in response to a data object (folder) request,[2] the data object (folder) may be "generat[ed]" or "creat[ed]" instead of an already-existing data object (folder) being located:

> In another aspect, a data object located and/or otherwise identified in response to receiving a data object identification request must meet match a query identified by the data object identification request. ***Alternatively or additionally***, ***a data object identification request*** may include an instruction and/or input for ***generating a data object***. . . . ***Generating a data object*** may include ***creating the data object*** and/or may include modifying and/or otherwise transforming an existing data object. For example, execution environment 401 of second node 504 may include a template stored in a file system. A data object identification request may identify the template. A query handler component 402 may operate to identify a document or other data object that ***may be created, is being created,***

---

[2] Google admits that the "data object request" is "analogous" to the "information associated with at least one folder."  (Br. at 6.)

> ***and/or has been created*** based on the template. In response to an access request,
> execution environment 401 of second node 504 may return the document.

('215 patent at 43:40-56.)

Google's argument that the '215 patent only teaches a search for "existing data" is therefore contradicted by the specification itself, and should be rejected. Google's oversight completely undermines its arguments, as "there is a strong presumption against a claim construction that excludes a disclosed embodiment." *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1220 (Fed. Cir. 2020); *Nobel Biocare Servs. AG v. Instradent USA, Inc*., 903 F.3d 1365, 1381 (Fed. Cir. 2018) ("we 'ha[ve] cautioned against interpreting a claim term in a way that excludes disclosed embodiments, when that term has multiple ordinary meanings consistent with the intrinsic record'"); *Eko Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc*., 946 F.3d 1367, 1373 (Fed. Cir. 2020).

Similarly, Google's reference to the claimed "creat[ion]" of a "representation" of the folder is misplaced. As established by both the claims and the specification, creation of a "representation" is a separate operation, as compared to the receipt of "information associated with at least one folder" that the limitation at issue is directed to. (*See* '353 patent cl. 1; '737 patent cl. 1; '215 patent cl. 1.)

In summary, the plain language of this limitation, in the context of the claims as a whole, confirms that the "information associated with [the] at least one folder" does not have to be associated with an "pre-existing folder." Instead, the specification contemplates that such a folder would be created at the time the information is received and associated. Because Google's proposed construction would impose extraneous limitations on the claim and read out these express disclosures of the specification, it should be rejected. No construction is necessary.

### 2.    "immediately follows" ('215 patent, cls. 19, 45)

| Motion Offense's Proposed Construction | Google's Proposed Construction |
|---|---|
| No construction necessary | Indefinite |

Google's argument that this limitation is indefinite is frivolous and misplaced.  Google implicitly acknowledges that a POSITA would have understood its proper meaning, but nevertheless proposes alternative "temporal" definitions in an attempt to manufacture an indefiniteness issue.  The phrase "immediately follows" is easily understood by a POSITA in view of the claims as a whole, and is consistent with one of Google's proposed meanings.  The limitation is not indefinite.

The context in which the limitation appears in the claims confirms that it is not indefinite.  Specifically, the claims use the phrase to indicate that one *user input* "immediately follows" another:

> 19. The method of claim 1, wherein the information associated with the at least one folder is capable of being collected utilizing the first user interface element in response to a first single user input, the at least one object associated with the at least one email address is capable of being collected utilizing the second user interface element *in response to a second single user input that immediately follows the first single user input*, and the selection is capable of being detected utilizing the third user interface element in response to a third single user input that immediately follows the second single user input.

('215 patent cl. 19.)

A POSITA would understand this limitation in the context of the claim to refer to events occurring in a sequence, irrespective of the actual time elapsed between the events.  (Akl Decl. at ¶ 35.)  For example, if events A, B, and C, occur in a sequence, then B immediately follows A, and C immediately follows B.  (*Id.* at ¶ 35.)  This understanding of a POSITA is most aligned with Google's second proposed meaning, which confirms that the limitation is not indefinite.  (*Id.* at ¶¶ 36-37.)

7

On the other hand, Google's first and third proposed meanings depart from this plain and ordinary meaning and are not supported by the claims.  With respect to Google's first proposed meaning ("one user input must follow another user input within a matter of milliseconds, or seconds, or minutes"), the claims do not contain any specific temporal requirement, only an uninterrupted series of processes or steps.  (Akl Decl. at ¶ 38.)  Google's third proposed meaning ("it must occur within a period of time (which is undefined) after the preceding user input") should be rejected for the same reasons.  Moreover, the '215 patent specification does not provide any support for these incorrect interpretations, and Google fails to cite any such teaching.  (Akl Decl. at ¶ 39.)

This limitation therefore informs those skilled in the art about the scope of the invention with reasonable certainty, and is not indefinite.  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).  Rather, Google's arguments suggest that its purported "plurality" of meanings vary only in their ***breadth***.  (Akl Decl. at ¶ 40.)  However, courts have repeatedly held that breadth of a claim limitation is not to be equated with indefiniteness.  *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017) ("Breadth is not indefiniteness.") (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1341 (Fed. Cir. 2005)); *In re Miller*, 441 F.2d 689, 693 (CCPA 1971); *In re Gardner*, 427 F.2d 786, 788 (CCPA 1970).  Based on Google's own argument, therefore, the phrase "immediately follows" is not indefinite.

On the other hand, Google's cited case law is inapposite because none of those cases involved the phrase at issue here.  None of those cases even involved a first and second user input.  Instead, many courts have previously found limitations that include the exact phrases here, "immediately" and "follows," to either not require construction or incorporated them into constructions of other terms.  *See, e.g.*, *Smartmetric, Inc. v. Mastercard Int'l*, No. 2:10-cv-1864-JHN-FMOx, 2011 U.S. Dist. LEXIS 170605, at *25 (C.D. Cal. May 18, 2011) (ruling that no

8

construction was necessary for the claim phrase "application program is immediately triggered upon insertion of said data car into said data card reader"); *OPTi Inc. v. nVidia Corp.*, No. 2:04-CV-377 (TJW), 2006 U.S. Dist. LEXIS 22377, at *35 (E.D. Tex. Apr. 24, 2006) (construing the phrase "next-line" to mean "the line ***immediately following*** the line being transferred"). Use of the exact phrase at issue here in the constructions of other terms is indicative of its definite nature.

### B.     U.S. Patent No. 10,803,140

#### 1.     "transform" ('140 patent, cls. 1, 3, 9, 10, 22, 23, 25, 26)

| Motion Offense's Proposed Construction | Google's Proposed Construction |
| --- | --- |
| No construction necessary | Indefinite |

Google's assertion that the word "transform" has "no ordinary meaning to a POSITA in the context of the claims" is disingenuous. The claim limitation, when read in context with the surrounding claim language, is clear. A POSITA would understand that to transform means to change. (Akl Decl. at ¶ 42.) Here, transforming for presentation in a window (such as in a browser tab) involves modifying data to be suitable for presentation via a visual representation. (Akl Decl. at ¶ 43.) The extrinsic evidence supports this understanding of the term. (Ex. 2 at MOTIONGO_019723; Akl Decl. at ¶ 44.) Specifically, the claims leave no doubt that a POSITA would be informed about scope of such a transformation with reasonable certainty, and the limitation is not indefinite. *Nautilus*, 572 U.S. at 910.

Google again attempts to manufacture an indefiniteness issue by raising other allegedly possible definitions of "transform" and feigns confusion. It argues transform could be any one of (1) "merely displaying content in a window"; (2) "***a portion of the URL causes*** the content to be ***altered*** or ***modified*** in some way (which is undefined) before it is displayed in a window." (Br. at 11.) However, Google's purported possible meanings are not mutually exclusive, and Google

does not even make that argument.  (Akl Decl. at ¶ 45.)  To a POSITA, the plain and ordinary

meaning would encompass those articulations (but not be limited to just that).  (*Id.* at ¶ 45.)

Noticeably Google has focused on a single word for construction but provided a much longer set

of allegedly possible constructions.  Its articulations have no support in the claims.  (*Id.* at ¶ 45.)

Google next implies that the relationship between the term "transform" and the preceding

phrase "based on the . . . URL," ('140 patent cl. 1), is "undefined."  This is a straw man.  The

plain language of the claim at issue demonstrates that the claim requires only that "**based on the**

**first URL**, **transform, by a first computing process, the first content for presentation in the**

**first window associated with the first tab**."  In other words, the phrase "**based on the first**

**URL**" broadly applies to *any aspect* of the remaining claim phrase marked **in red**.  (Akl Decl. at

¶ 46.)  The phrase "transform," when viewed in the context of the broader red phrase, is not

indefinite.

The '140 patent specification confirms that the phrase "transform" is not indefinite.  The

exemplary disclosures from the specification below show that the patent repeatedly uses the

phrase "transform" according to its plain and ordinary meaning:

> An "operating environment", as used in the present disclosure, is an arrangement
> of hardware and/or software that may be further *modified, transformed, and/or*
> *otherwise configured* to include and/or otherwise host an arrangement of
> components including logic that is executed to perform a method of the subject
> matter described in the present disclosure.

('140 patent at 4:60-65.)

> The input information may be received by the user interface element handler in
> response to a user input detected via an input device of an operating environment.
> Information that is *transformed, translated, and/or otherwise processed* by logic
> in presenting a user interface element by the output device is referred to in the
> present disclosure as "presentation information" with respect to the logic.

(*Id.* at 6:48-54.)

> The user agent client includes logic to send the data and/or a *transformation of*
> *the data to present output*, such as a web page, via an output device.

10

(*Id.* at 14:15-18.)

(Akl Decl. at ¶ 47.)  Moreover, the specification demonstrates that a transformation as recited by the claims can include a number of steps for preprocessing the content and preparing it for presentation in a window:

> Alternatively or additionally, the first user agent 505 may ***preprocess*** some or all of the ***markup*** to ***generate presentation information*** suitable for the particular user agent client 501 such as image data and/or audio data that may be relayed as presentation information to a device driver of a suitable output device.

('140 patent at 24:24-28.)

> For example, resource having a MIME type of image/* may be provided to a particular user agent for ***preprocessing*** and to a particular user agent client for presenting via an output device.

(*Id.* at 69:21-25.)

> Logic to perform block 402 and/or block 406 may be included in logic for creating, ***modifying, sending, receiving, and/or otherwise processing an HTTP message*** or analogous logic for another application protocol. For example, an HTTP protocol service 513 and/or user agent 505 may detect a criterion in a header of an HTTP message, a request line, a status code, and the like. Logic to perform block 402 and/or block 406 may be included in logic for ***creating, modifying, sending, receiving, and/or otherwise processing MIME resource*** by a user agent 505 and/or a user agent client 501. For example, a content manager component 502, shown in a user agent 505, may detect parts of the multi-part MIME resource to route to suitable content handlers 515

(*Id.* at 20: 42-55.)

> A 'user interface element handler' component, as the term is used in the present disclosure, refers to logic that when executed operates to send ***information to present a user-detectable representation of a processed entity*** by an output device, such as a display. . . . Information that is transformed, translated, and/or otherwise processed by logic in presenting a user interface element by the output device is referred to in the present disclosure as "presentation information" with respect to the logic. ***Presentation information*** may include and/or may otherwise identify data that is valid according to one or more schemas (defined below). Exemplary schemas for include raw pixel data, JPEG for image data, video formats such as MP4, markup language data such as defined by a schema for a hypertext markup language (HTML) and other XML-based markup, a bit map, and/or instructions such as those defined by various script languages, byte code, and/or machine code. For example, a web page received by a browser from a remote application provider may include HTML, ECMAScript, and/or byte code

processed by logic to present one or more user interface elements included in a user interface of the remote application.

(*Id.* at 6:41-67.)

The first user agent client 1601 may operate in a first computing process of operating environment that also includes the first user agent client 1601 in FIG. 16. ***The first user agent 1605 may operate in the first process to detect and/or identify a criterion to present first output based on a first resource received and/or otherwise identified by the first user agent 1605 and/or the first user agent client 501***. The criterion may identify the first user agent client 501 for presenting the first output. The first user agent 1605 may invoke, for example via function call, logic in the first user agent client 1601 to send first presentation information based on the first resource to present the first output in a first child user interface element 1804 corresponding to a first tab user interface element 1806 of the first user interface element 1802. ***A second user agent 1605 may operate in a second computing process that includes a second browser 1603. The second user agent 1605 may detect a criterion for presenting second output based on a second resource received and/or otherwise identified by the second user agent 1605.*** In an option, the second user agent 1605 may interoperate, based on the criterion, with the first user agent client 1605, for example via an interprocess communication mechanism, to execute logic in the first user agent client 1605 operating in the first computing process to send second presentation information to present the output based on the second resource in a in a second child user interface element 1808 (hidden behind the first child user interface element 1804 in FIG. 18, The second child user interface element corresponds to a second tab 1810.

(*Id.* at 45:19-52.)

A user agent client 501 may respond to and/or may provide one or more criteria shown in the request 700 for identifying and/or otherwise selecting a user agent 505 and/or a user agent client 501. As described, a user agent client 501 may identify and/or otherwise detect in URL 704 or a portion thereof to provide to a user agent 505 to include in the request line 702. The URL may include a criterion. ***A domain identifier (e.g. www.otherSite.net in URL 704) may be processed by logic in a user agent client 501, a user agent 505, and/or a service application as a criterion and/or part of a criterion that identifies a user agent and/or user agent client to send the request 700 and/or to process the response 721. A user agent client 501 may process a domain identifier and/or other criterion by selecting a particular user agent 505 and/or determining one or more acceptable user agents for sending the request 700 and/or for receiving the response 721.*** For example, a specified domain identifier and/or a group of domain identifiers may be associated with a specified browser and/or a specified browser attribute such as a performance attribute, a security attribute, a content handler type, and/or support for a specified scripting environment or other operating environment (e.g. a Java Virtual Machine)—to name a few examples. A browser may include a user agent and a user agent client. For example, MICROSOFT.COM may be associated with INTERNET EXPLORER,

12

> LINKEDIN.COM may be associated with a user agent provided by GOOGLE and a user agent client provided by the MOZZILA FOUNDATION.

(*Id.* at 29:39-66.)

(Akl Decl. at ¶ 48.)  Each of these disclosures further confirms what the claims themselves establish: that "transform" is utilized in its well understood plain meaning. Computers with displays have been around for decades.  A POSITA would certainly have known how to transform data to be suitable for presentation via a visual representation.  (Akl Decl. at ¶ 49.)  Any argument to the contrary is baseless.

Indeed, Google's argument is again best understood as directed to the breadth of the phrase "transform" as used in the claims, rather than an indefiniteness issue.  (Akl Decl. at ¶ 50.) However, breadth of a claim limitation is not to be equated with indefiniteness.  *BASF Corp.*, 875 F.3d at 1367; *In re Miller*, 441 F.2d at 693; *In re Gardner*, 427 F.2d at 788.  Based on Google's own argument, the word "transform" is not indefinite.

### 2. "simultaneously" ('140 patent, cl. 1)

| Motion Offense's Proposed Construction | Google's Proposed Construction |
| --- | --- |
| No construction necessary | Indefinite |

Google again attempts to manufacture ambiguity when none exists.  Google has identified "simultaneously" as a disputed term but goes on to make numerous arguments using various other limitations instead.  To the extent it is asserting "simultaneously" is indefinite, that is nonsensical.  The patent does not contain lexicography.  Thus that term should be given its plain and ordinary meaning: at the same time.  (Akl Decl. at ¶ 52.)

Google's "multiple possible definitions," which are in essence multiple proposed constructions, appear to be:

- "two distinct pieces of content being displayed on screen at the same instant";

- "two pieces of content appearing together on screen";

- "two pieces of content being displayed by use of processes running completely in parallel"; or

- "something else."

(Br. at 13-14.)

The above possibilities are artificial constructs fabricated by Google, and not how a POSITA would have understood the claims.  (Akl Decl. at ¶ 53.)  For example, Claim 1 of the '140 patent recites:

> "based on the second URL, ***transform***, by the first computing process, the second content ***for presentation***, **simultaneously** with the first content, in the first window associated with the first tab;
>
> . . .
>
> based on the third URL, ***transform***, by a second computing process, the third content ***for presentation***, ***simultaneously*** with the first content, in the first window that is associated with the first tab and that is not associated with a second tab**, such that the first content and the third content share a same web page display region by being presented as part of a same single web page**"

As the language highlighted (in **red**) above clarifies, the term "simultaneously" refers to the [second/third] content being transformed for presentation ***at the same time*** as the first content.  (Akl Decl. at ¶ 54.)  The claim then elaborates on this ordinary usage of "simultaneously," which is easily understood by a POSITA, to explain that "the first content and the third content share a same web page display region by being presented as part of a same single web page."  (*Id.* at ¶ 55.)

The '140 specification supports the ordinary usage of "simultaneously" in the claims. For example, the specification clarifies that "both the first output and the second output may be presented ***in a same user interface element***."  ('140 patent at 52:65-67.)  A POSITA would therefore understand with reasonable certainty that the second output may be transformed for

presentation "at the same time" as the first output, and the phrase "simultaneously" is not indefinite.  (Akl Decl. at ¶ 56.)

Google is similarly wrong that the phrase "simultaneously" is indefinite as a "term of degree."  (Br. at 14; Akl Decl. at ¶ 57.)  Nothing suggests it is a term of degree as opposed to its plain meaning above, and in any event terms of degree are not per se indefinite.  *Interval Licensing LLC v. AOL, Inc.,* 766 F.3d 1364, 1370 (Fed. Cir. 2014) ("Claim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention.").  In any event, this argument is a red herring, as Google does not cite ***anything*** in the claims or specification supporting the use of "simultaneously" as a "term of degree."

Google then tries to create ambiguity surrounding when the "***request*** to access" of content is "***initiated***," rather than when the "display" of such content is completed.  However, this is another red herring, as the claims do not require any "request."  (Akl Decl. at ¶ 58.)  Importantly, the phrase "simultaneously" does not even qualify the phrase "access," as the claimed "access" is completed as a separate operation ***prior*** to the "transformation" that results in two pieces of content being "transform[ed] . . . for presentation simultaneously":

> "***access,*** utilizing the second URL, the second content, and
>
> based on the second URL, ***transform***, by the first computing process, the second content for presentation, ***simultaneously*** with the first content, in the first window associated with the first tab;"

('140 patent, cl. 1.)

(Akl Decl. at ¶ 58.)  Thus, each of Google's "possible" interpretations is divorced from the actual claims and specification, and none gives rise to an indefiniteness issue.  (*Id.* at ¶ 59.)  Google appears to recognize this fact, as it then purports to question whether "simultaneously" qualifies the phrase "transform" or "for presentation."  (Br. at 15-16.)  However, even this

alleged *fifth* basis for ambiguity fails, as it does not alter the plain and ordinary meaning of "simultaneously" or how a POSITA would view the term in the context of the claims.  Indeed, the specification repeatedly describes events occurring simultaneously (at the same time).  (*See, e.g.*, '140 patent at 52:64-65, 45:43-49, 72:35-36, 75:56-60.)  (Akl Decl. at ¶ 60.)

Google's argument is therefore best understood as directed to the breadth of the phrase "simultaneously" as used in the claims, rather than an indefiniteness issue.  (Akl Decl. at ¶ 61.) However, breadth of a claim limitation is not to be equated with indefiniteness.  *BASF Corp.*, 875 F.3d at 1367; *In re Miller*, 441 F.2d at 693; *In re Gardner*, 427 F.2d at 788.  Based on Google's own argument, the word "simultaneously" is not indefinite.

Google's other arguments related to prosecution of the '140 patent merely repeat its earlier criticisms of the patent and should be disregarded.  For at least the above reasons, the Court should that the claim term "simultaneously" is not indefinite.

### C.   U.S. Patent No. 10,904,178

#### 1.   "attachment" ('178 patent, cls. 1-4, 18, 19)

| Motion Offense's Proposed Construction | Google's Proposed Construction |
|---|---|
| A portion of a communication that includes data from one communicant to another other than data in the message portion. | A portion of a communication that includes data from one communicant to another other than data in the message portion. |

Motion Offense no longer disputes the construction of this phrase.

### D.   U.S. Patent No. 10,949,507

#### 1.   "security criterion" ('507 patent, cls. 1, 40, 42, 73)

| Motion Offense's Proposed Construction | Google's Proposed Construction |
|---|---|
| No construction necessary | Indefinite |

As with its other indefiniteness challenges, Google overlooks the plain language of the claims and the disclosures of the specification and attempts to manufacture an indefiniteness issue over a phrase well understood by a POSITA.  "Security criterion" is a term that a POSITA would have readily understood based on the claims alone.  (Akl Decl. at ¶ 63.)  The specification contains no lexicography.  But none is required, particularly for well known terms.  In the context claimed, this phrase would have been readily understood by a POSITA to mean a security setting or attribute.  (*Id.* at ¶ 63.)

While Google argues that the claims "do not explain what a 'security criterion' is," (Br. at 18), the phrase is self-explanatory.  (Akl Decl. at ¶ 64.)    It takes the self-imposed blinders of patent litigation to assert confusion.  Moreover, the claims indicate how the claimed "security criterion" is to be *used*.  (Akl Decl. at ¶ 64.)  Specifically, "the HTML content is presented via the native application if the 'security criterion' is met, and if it is not met, the content is presented via the web browser."  ('507 patent cls. 1, 42.)  This description is sufficient for a POSITA to discern its scope.  (Akl Decl. at ¶ 64.)  For example, a POSITA would understand that a security criterion can have many applications in the field of art of the '507 patent.  Specifically, a security criterion may relate to authentication (such as with public or private key cryptography, or by using HTTPS instead of HTTP for a webpage), as recited by dependent claim 40, or to security credentials to avoid DNS spoofing.  (Akl Decl. at ¶ 65.)

Google's argument concerning "extensive, non-exhaustive lists of possibilities" for the term "criterion" is misplaced.  As with its other indefiniteness arguments, Google's blinkered assertions regarding the phrases "criterion" and "security criterion" are best understood as directed to their breadth as used in the claims, rather than any indefiniteness issues.  (Akl Decl. at ¶ 66.)  But the breadth of a claim limitation is not to be equated with indefiniteness.  *BASF Corp.*, 875 F.3d at 1367; *In re Miller*, 441 F.2d at 693; *In re Gardner*, 427 F.2d at 788.  Based on

Google's own arguments, the limitation "security criterion" is not indefinite.  In any event, even if a POSITA may interpret the limitation "security criterion" as broadly as Google contends (which a POSITA would not) (see Akl Decl. at ¶ 67) , such breadth itself would not make the phrase indefinite as "security criterion" is one of many limitations within the claim as a whole, much as the phrase "processing system" is not indefinite even though it could capture every computer in the world.  *See Cox Commc'ns., Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1233 (Fed. Cir. 2016).

Google's reliance on any purported ambiguity from the phrases "security policy," "security setting," "security attribute," or "authentication function" in dependent claims 40, 65, and 73 is similarly misplaced because Google does not contend that any of those terms are indefinite on their own.  Google should not be permitted to incorporate any such arguments into its arguments regarding "security criterion."  Rather, the usage of "security criterion" throughout the claims and specification consistently with its well understood meaning confirms that this limitation is not indefinite.  (Akl Decl. at ¶ 67.)

## III.   CONCLUSION

For the reasons set forth above, Google's proposed constructions should be rejected and the Court should find that none of Google's proposed terms require construction.

18

Dated:  February 17, 2022          DEVLIN LAW FIRM LLC

*/s/ Derek Dahlgren*
Timothy Devlin
Derek Dahlgren (pro hac vice)
Srikant Cheruvu (pro hac vice)
Mariam E. Clayton (pro hac vice)
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010
tdevlin@devlinlawfirm.com
ddahlgren@devlinlawfirm.com
scheruvu@devlinlawfirm.com
mclayton@devlinlawfirm.com

*Attorneys for Motion Offense, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

*/s/ Derek Dahlgren*
Derek Dahlgren